# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 5331 | **DATE** | AUG 2 3 2000 |
| **CASE TITLE** | Tokar v. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons stated in the attached Memorandum Opinion and Order, Plaintiff's motion to alter or vacate judgment or grant rehearing [#124-1,2,3] is granted in part and denied in part. This court's previous judgment in favor of the City, entered on December 21, 1999, is hereby vacated to the extent that it is inconsistent with this opinion and order. No hearing is necessary. This case shall proceed to trial on the matter of whether Tokar's placement on paid leave constituted a retaliatory act.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | AUG 25 2000 date docketed | | 124 |
| X | Docketing to mail notices. | | | |
| | Mail AO 450 form. | MF docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | |
| | | FD-7 FILED FOR DOCKETING 00 AUG 24 PM 4:01 | date mailed notice | |
| | dc(lc) | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

KATHLEEN TOKAR,            )
                           )
         Plaintiff,        )
                           )
         v.                )  No. 96 C 5331
                           )
CITY OF CHICAGO,           )  HONORABLE DAVID H. COAR
                           )
         Defendant.        )

**DOCKETED**
**AUG 2 5 2000**

## MEMORANDUM OPINION AND ORDER

In August 1996, Kathleen Tokar ("Tokar") filed a civil rights action in this court against the defendant City of Chicago ("City"). She alleged that the City retaliated against her for filing employment discrimination charges with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. In a Memorandum Opinion and Order issued on December 21, 1999, this court granted the City's motion for summary judgment. Tokar now urges the court to alter or vacate that judgment and grant a rehearing pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. For the reasons discussed below, Tokar's motion is granted in part and denied in part.

### I. Standard of Review

Motions for reconsideration serve a "limited function: to correct manifest errors of law or fact or to present newly discovered evidence." Keene Corp. v. International Fidelity Ins. Co., 561 F. Supp. 656, 665-66 (N.D. Ill. 1982), aff'd 736 F.2d 388 (7th Cir. 1988). Accordingly, a

court will entertain a motion for reconsideration only where "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990) (quoting Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va. 1983)).

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when, viewing the record in a light most favorable to the non-moving party, a factfinder could reasonably return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 479 (7th Cir. 1996). The moving party bears the initial burden of establishing that no genuine issues of material fact exist for resolution by the jury. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). To defeat summary judgment, the non-moving party must furnish "more than a scintilla of evidence" in support of her position. Silk v. City of Chicago, 194 F.3d 788, 798 (7th Cir. 1999).

## II. Factual Background

After reviewing the materials submitted by the plaintiff in her motion for reconsideration, it appears that the court's prior rendition of the facts of this case was incomplete, and the legal conclusions flowing therefrom erroneous. The court misapprehended a critical fact which

changes the court's stance on whether Tokar satisfactorily demonstrated a causal nexus. The following statement of facts therefore supercedes that set forth in this court's prior opinion. To the extent that this court's prior statement of facts was correct, those facts are restated herein.

Kathleen Tokar was employed by the City of Chicago from 1986 until 1995 as a motor truck driver in the Department of Streets and Sanitation ("Department"). On or about June 4, 1992, she filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"). Tokar alleged that the City had discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Americans with Disabilities Act, 42 U.S.C. § 12203 et seq. Tokar subsequently amended her charge in April 1993 and again in June 1994.

Throughout the tenure of her employment at the City, Tokar filed a total of 38 worker's compensation actions. Leon Stiles ("Stiles"), Assistant Corporation Counsel in the Workers' Compensation Division for the City, was involved with Tokar's cases beginning approximately 1990. In a letter dated October 16, 1992, Stiles wrote to Robert Serafin ("Serafin"), the Director of the Workers' Compensation Division regarding Tokar. Noting that Tokar had filed "numerous claims against the City, the majority of which have no merit," Stiles stated that it had come to his attention during an arbitration that Tokar might be suffering from psychological problems. He requested that Tokar be examined both by an orthopedic surgeon and a psychiatrist.

In March 1993, the City sent Tokar to be evaluated by Dr. Brian Lipson ("Lipson"). Lipson, in turn, asked Dr. Eugene Morrissy ("Morrissy"), a board certified clinical psychologist, to evaluate Tokar. Morrissy found that Tokar was "experiencing some form of a psychotic

disorder." Although he urged treatment, Morrissy concluded that Tokar "appears to function on the job at an at least marginally functional level."

After Tokar filed a discrimination charge against the City, her worker's compensation claims received a hearing before the Illinois Industrial Commission ("IIC"). At the hearing, an investigator from the Illinois Human Rights Commission ("HRC") identified herself to Stiles and alerted him that the HRC was monitoring Tokar's case in the aftermath of Tokar's discrimination charges. On September 10 1993, Arbitrator Milton James, who presided over Tokar's hearing, concluded that Tokar had filed compensable claims that could result in findings of temporary total disability. The arbitrator ordered the City to arrange medical and psychiatric evaluations for Tokar, pursuant to agreement by the parties.

In a letter dated September 13, 1993 ("1993 Stiles' letter"), Stiles relayed to Serafin the arbitrator's decision:

> Attached please find a copy of the 19(b) Decision issued on September 10, 1993 by Arbitrator Milton James. This agreed order was issued after a pre-trial conference, in which the Arbitrator determined that if the claims had preceded to trial, he would find the Petitioner a permanent total disability, with at least 2 ½ years of back TTD and total penalties.
> The Petitioner has filed a human rights petition against the City, and the case was monitored by an investigator from the Illinois Human Rights Commission. It was therefore necessary to enter into this agreed order, at least to give us more time to acquire <u>any investigation to show the condition of Petitioner is not work related.</u>
> <u>The Decision is self explanatory. TTD is awarded for the period of time from the psych exam to the present, and continuing throughout Rehabilitation Efforts and Work Capacity Exam. It is my opinion that out-placement employment should be sought to remove this problematic employee from the City rolls. If we do not comply with this order, we can be subject to a great loss on these claims.</u>

(underlining in original).

Apparently, Stiles' 1993 letter was forgotten until the week of September 15, 1994, when it resurfaced. At that time, Stiles spoke with Denise Lanton ("Lanton"), the Streets and Sanitation Department's liaison for labor affairs about Tokar. Stiles forwarded to Lanton a copy of his 1993 letter along with a copy of the arbitrator's decision.

On September 22, 1994, Lanton conferred with William Bresnahan ("Bresnahan"), Assistant Commissioner of the Department and Lanton's supervisor. At his deposition, Bresnahan claimed sole responsibility for deciding to place Tokar on paid administrative leave. However, the City acknowledges that Lanton made the recommendation, adopted by Bresnahan, that Tokar be placed on leave pending the outcome of her psychological testing. (56.1(b)(3) Stmt. at ¶ 76).

When he was informed by Lanton that the City had ordered a psychological examination of Tokar, Bresnahan's "instincts [told him that] if there was a reason that Ms. Tokar had to be seen by a psychiatrist, then there was probably a safety concern for the people who would be out on the street when Ms. Tokar was driving the vehicle." Bresnahan was also concerned about Tokar's driving record, and specifically noted that she had had multiple chargeable accidents within a 14-15 month period.[1] In reaching his decision to place Tokar on paid leave, Bresnahan did not examine Tokar's medical records.

When asked to identify the ways in which, as Lanton noted in her September 22, 1994 letter, Tokar was "having a detrimental effect on the department's operational needs," Bresnahan explained that Tokar's supervisors disliked working with her. Bresnahan specifically cited to

---

[1] Lanton acknowledged that Tokar had no serious infractions in her personnel record and no problems with attendance.

complaints lodged by several of Tokar's direct supervisors, but when directly questioned, these individuals denied having any problems with Tokar personally or with her performance.

After her conversation with Stiles, Lanton also spoke to Serafin to inquire whether Tokar had had psychological testing. Serafin informed her that he had no record of such testing. Lanton forwarded Stiles's 1993 letter to Serafin along with a memo dated September 22, 1994. Lanton's memo recalled the discussion with Serafin concerning Tokar and stated that Tokar would be immediately placed on paid leave status pending psychological examinations. Lanton's memo added: "Ms. Tokar's behavior is having a detrimental effect on the department's operational need and she has become a safety concern for herself and those with whom she must work. . . . Since Ms. Tokar's employment she has had 8 accidents . . . and at this writing 38 Workmen's Compensation claims against the City."

Throughout her tenure with the City, Tokar had been involved in eight motor truck accidents. Four accidents, all chargeable to Tokar, had occurred on June 29, 1987, February 26, 1988, August 26, 1988, and October 26, 1988. These incidents involved scraping a fence, a cable, and a parked car. Four additional accidents, all nonchargeable, occurred in 1987 and 1988, except for one which occurred in January of 1994. All of the nonchargeable accidents involved scrapes with parked cars, and in one instance, a basketball rim.

In a letter dated September 22, 1994, Tokar was informed that, effective September 23, she would be placed on paid administrative leave pending outcome of a psychiatric examination. Tokar continued to receive her regular salary during her paid leave period.

In or about October, 1994, Tokar was referred to the Isaac Ray Center for psychiatric evaluations. In or about December, 1994, Dr. James Janik ("Janik"), a clinical psychologist, and

Dr. Mark McClung ("McClung"), a psychiatrist, issued extensive written reports on Tokar's psychiatric condition. Dr. Janik concluded that Tokar suffered from a delusional disorder, persecutory type, and a schizoid personality disorder with antisocial and narcissistic traits. He noted that Tokar "evidences firm indications of persecutory delusions [and as a result]., there is a great danger that she may act out in perceived self-protection against innocent citizens who may quite accidently have [the race and ethnic-specific] characteristics [of her delusional persecutors]. . . . Given [her] psychotic experiences, it is reasonable to be concerned that she might find herself acting on these psychotic thought processes while driving and again put herself or others at risk." Dr. McClung's diagnosis confirmed Janik's findings.

After reviewing the psychiatric reports, Bresnahan recommended to Eileen Carey ("Carey"), Commissioner of the Department, that Tokar be precluded from returning to her job. Carey authorized Tokar's removal from paid leave status. In a letter dated January 3, 1995, Bresnahan notified Tokar that she would be removed from paid administrative leave effective January 6, 1995. The letter stated that the doctors had concluded that Tokar was unfit to return to duty as a motor truck driver, and had further recommended that she seek professional treatment for her psychiatric condition. The letter also requested that Tokar submit any medical evidence that contradicted the conclusions of the Isaac Ray doctors. Once such materials were submitted, Tokar would be required to be reevaluated by the Isaac Ray Center.

Tokar requested a leave of absence commencing on January 7, 1995. She was placed on unpaid leave as of that date. By taking a leave of absence, Tokar left open the possibility of reinstatement, although that never transpired. That same month, Tokar began seeing Dr. Blaise Wolfrum ("Wolfrum"), a psychiatrist. He diagnosed her with paranoid disorder, persecutory

subtype, which is classified as a psychosis. He prescribed medication to aid Tokar in controlling her anxiety and delusions.

In a letter dated February 20, 1995, Dr. Wolfrum wrote to Bresnahan, urging him to reinstate Tokar to her former job. He stated that "I feel that she may be fit to return to her employment responsibilities if certain accommodations for her personal difficulties are made." He did not, however, suggest any specific accommodations. On March 9, 1995, Wolfrum sent another letter to Bresnahan, stating in relevant part, that while Tokar "continues to have paranoid delusions and poor insight, she is taking medication (Stelazine) and is desiring to return to work."

On March 21, 1995, Bresnahan sent a reply letter to Dr. Wolfrum, indicating that the latter's statements "are not helpful in terms of evaluating Ms. Tokar for employment since you have not stated what job duties Ms. Tokar is capable of performing and what accommodations you believe would be appropriate. . . . I am left to speculate as to what, if anything, might be done." Bresnahan urged Dr. Wolfrum to make specific requests for accommodation before Tokar could be reconsidered for active duty.

In or around July, 1995, the City again referred Tokar to the Isaac Ray Center for a psychological examination. Dr. Orest Wasyliw ("Wasyliw"), the Director of Adult Clinical Psychology at the Isaac Ray Center, conducted a clinical examination of Tokar. He determined that she remained unfit to return to her previous employment because of her psychosis. Wasyliw was aware of Tokar's treatment with Dr. Wolfrum, but he nevertheless cautioned that Tokar's "prognosis for substantial improvement must be considered highly guarded."

On October 19, 1995, Dr. Wolfrum wrote to Bresnahan, stating that "I don't feel that [Tokar] is a danger to herself or others and I do not expect her medication to interfere with her motor skills. . . . I am writing at her request to support this return to work." Upon reviewing this letter, Bresnahan concluded, based on the Isaac Ray Center evaluations, that Tokar remained unable to perform her duties. On February 20, 1996, Dr. Wolfrum sent yet another letter to Bresnahan. Dr. Wasyliw reevaluated Tokar and reached the same conclusion as he had in July, 1995; he reconfirmed that Tokar remained unfit for employment. Several times in late 1996, Dr. Wolfrum wrote to the City, urging Tokar's reinstatement, but to no avail.

On or about September 25, 1995, Tokar filed another complaint with the IDHR and the EEOC, this time alleging that the City retaliated against her in violation of Title VII and the ADA. She filed a complaint in this court on August 23, 1996. The discrimination claim asserted in Tokar's amended complaint was dismissed on February 17, 1998. On December 21, 1999, this court entered summary judgment against Tokar on her retaliation claims. The court now vacates the prior entry of summary judgment.

### III. Analysis

Title VII and the ADA prohibit employers from retaliating against an employee for exercising her right to pursue discrimination claims. See 42 U.S.C. § 2000e-3(a) (prohibiting "discriminat[ion] against any [employee] . . . because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under [Title VII]"); Eiland v. Trinity Hosp., 150 F.3d 747, 753 (7th Cir. 1998) (discussing Title VII's antiretaliation provision); 42 U.S.C. § 12203(a) (ADA); Roth v. Lutheran General Hosp., 57 F.3d 1446, 1459

-9-

(7th Cir. 1995) (ADA). To prevail in a retaliation action, a plaintiff must first establish a prima facie case, which requires a showing of the following elements: (1) that she engaged in a statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there exists a causal connection between the protected activity and the adverse action. Johnson v. City of Ft. Wayne, Ind., 91 F.3d 922, 938-39 (7thC ir. 1996).

The City admits, for the purpose of the summary judgement motion, that Tokar engaged in statutorily protected expression when she filed charges of discrimination with the IDHR and the EEOC. The City also concedes that Tokar suffered adverse actions when she was placed on paid, and ultimately unpaid leave, and effectively prohibited from returning to active duty as a motor truck driver. Although the court previously found that Tokar failed to demonstrate a causal nexus between her protected activity (that is, the filing of her discrimination claims) and the adverse action (here, the City's decision to place her on leave), this conclusion was predicated on an incomplete and erroneous understanding of the record. With the full facts before the court, the court grants plaintiff's motion in part and denies it in part.

To establish a causal nexus, a plaintiff must demonstrate that her employer would not have taken the adverse action "but for" the protected action. McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 483. A "telling temporal sequence" may evidence a causal link. In other words, to discharge her burden, the plaintiff may set forth evidence that the adverse action took place "on the heels of the protected activity." Dey v. Colt Constr. & Dev't Co., 28 F.3d 1446, 1458 (7th Cir. 1994).

On the face of it, the chronology of events seems contraindicative of a causal link between the protected expression and the retaliatory acts. After all, twenty-seven months passed

between the time Tokar initially filed discrimination charges in June 1992 and the City placed Tokar on paid leave in September 1994. In its previous opinion, the court observed that Tokar could not identify when Lanton and Bresnahan, the apparent decisionmakers, first learned of her EEOC action against the City. Thus, the court determined that Tokar failed to establish a causal nexus because of the substantial time lapse between Tokar's filing of charges and the adverse acts taken against her. What was overlooked, however, was that the 1993 Stiles letter gave notice of Tokar's discrimination charges. When that letter is traced as it changed hands, it is clear that it brought about tangible, and more importantly, immediate, consequences, ultimately resulting in Tokar's initial placement on unpaid leave.

On September 10, 1993, the IIC arbitrator issued an order potentially exposing the City to significant liability for Tokar's worker's compensation claims. Three days later, Stiles wrote a letter to Serafin recommending that Tokar (whom he characterized as a "problematic employee") be "removed" from the "City rolls." Stiles' letter referred to the human rights petition Tokar had filed against the City and noted that the IDHR was monitoring her worker's compensation proceedings. Stiles warned that Tokar's claims could subject the City to a "great loss."

Serafin did not recall receiving the Stiles letter in September of 1993. Apparently, the letter was forgotten until it resurfaced the week of September 15, 1994, when Stiles forwarded the letter to Lanton. In turn, Lanton forwarded a copy of the letter to Serafin and Bresnahan. Within a week of Lanton receiving Stiles' 1993 letter-- which explicitly referenced Tokar's discrimination charges-- Bresnahan, upon Lanton's recommendation, prohibited Tokar from resuming her driving duties.

In this court's previous opinion, this court commented that Lanton, in her deposition, was vague about identifying the time at which she learned of Tokar's discrimination charges against the City. Stiles' 1993 letter, however, definitively put Lanton, as well as Bresnahan, on notice of Tokar's pending discrimination claims. Upon receiving this notice, Lanton and Bresnahan quickly took action against Tokar. It can be said, then, that this notice prompted Tokar's involuntary leave. The record, when viewed in the light most favorable to the plaintiff, at best bears out a causal nexus and at worst, raises a material issue for the jury.[2]

Once Tokar establishes her prima facie case, which she has succeeded in doing here, she creates a rebuttable presumption of retaliation. Kennedy v. Schoenburg, Fisher, & Newman, Ltd., 140 F.3d 716, 722 (7th Cir. 1998). The burden then shifts to the City to articulate a legitimate nondiscriminatory justification for its actions. Id. Once the employer supplies its explanation, the presumption of retaliation dissolves, and the burden shifts back to the plaintiff to demonstrate that the employer's justification is a pretext for retaliation. See Smart v. Ball State Univ., 89 F.3d 437, 439 (7th Cir. 1996).

Pretext means a "lie, [ ] a phony reason for some action." Russell v. Acme-Evans, Co., 51 F.3d 64, 68 (7th Cir. 1995). The plaintiff may show that a discriminatory reason more likely motivated her employer. In the alternative, the plaintiff may show that the defendant's asserted reasons are unworthy of credence, thereby raising the inference that the real reason is discriminatory. Essex v. United Parcel Service, Inc., 111 F.3d 1304, 1310 (7th Cir. 1997).

---

[2] For purpose of analyzing the facts to determine whether Tokar has made out a prima facie case, the court has lumped together her placement on paid leave and the subsequent placement on unpaid leave. The court recognizes that these issues could have been separated and, indeed, that is the approach taken in analyzing pretext.

Whether Tokar has successfully rebutted the City's proffered explanations will be analyzed separately as to the two adverse actions: Tokar's September 23, 1994 placement on paid leave and her January 6, 1995 placement on unpaid leave.

In its summary judgment brief, the City asserts that Tokar was "placed on paid leave in order to determine her fitness for duty as a Motor Truck Driver. The City's decision to send plaintiff for a psychological/psychiatric evaluation in the fall of 1994 was based on sound business and safety considerations." The court, in its prior opinion, dismissed as groundless the safety considerations expressed by Bresnahan. As discussed in that opinion, the safety concerns were not supported by the record. None of the accidents in which Tokar had been involved were recent or severe. In addition, when asked to identify instances in which Tokar posed a problem, Bresnahan cited sources which turned out to be false, further undermining the legitimacy of the accident-related safety argument.

In addition to citing Tokar's accident history, Bresnahan also maintained that the order requiring Tokar to be psychologically evaluated suggested her incapacity to operate a motor vehicle. This explanation, however, is somewhat suspect. Tokar's driving record raised no red flags, and there was no reason for Bresnahan to equate an order for a psychological examination (which had been outstanding for over a year) with a determination of Tokar's incapacity to perform her duties. In hindsight, the nature and severity of Tokar's psychosis lends credence to Bresnahan's assumption that Tokar's psychological condition jeopardized her ability to drive. But in September of 1994, when Lanton and Bresnahan first discussed placing Tokar on leave, there was no indication that Tokar's mental state would interfere with her job performance. There was no sense of urgency so as to necessitate that Tokar be placed on leave immediately,

pending her psychological examinations.[3] A factfinder could conclude that Bresnahan's concern was irrational and as such, unworthy of belief. In other words, a jury reasonably could reject Bresnahan's explanation.

When the plaintiff, upon establishing a prima facie case, is able to refute the employer's proffered justifications, the question of discrimination becomes one for the jury to resolve.[4] See Reeves v. Sanderson Plumbing Prod., Inc., – U.S. –, 120 S. Ct. 2097, 2108 (2000) (announcing that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). Accordingly, this court vacates the prior entry of summary judgment in favor of the City to the extent that it pertains to Tokar's placement on paid leave in September 1994.

With respect to the City's decision to place Tokar on unpaid leave in January 1995, however, the plaintiff's motion is denied. As explained in the court's prior opinion, the City's safety concerns provided a legitimate nondiscriminatory reason for the City's decision to remove Tokar from her status on paid leave and its refusal to reinstate her to active duty. Multiple doctors concurred that Tokar's psychological condition rendered her unfit to resume her driving duties.

---

[3] In fact, Tokar had remained on active duty while she previously underwent a psychological examination in March 1993 apparently at the behest of Stiles, who, in October of 1992, had urged that Tokar be tested.

[4] The court previously speculated that the City's actions were prompted by Tokar's repeated Workers Compensation claims. Whether or not the City retaliated against Tokar for filing discrimination charges or for filing multiple Worker's Compensation claims is a question for the jury.

-14-

Although Tokar attempts to undermine the soundness of the the City's expert opinions, she has not established that the City's asserted reason for prohibiting her return to duty were pretextual. The question is whether Bresnahan "honestly believed" that Tokar posed a danger. Essex, 111 F.3d at 1310. The difference of opinion between the City's doctors and Tokar's physician does not mean that Bresnahan did not honestly believe the Isaac Ray Center doctors, all of whom suggested that Tokar presented a risk to herself and others. Wolfrum took a tenuous position in advocating for Tokar's return, and failed to provide support for his stance. Thus, Bresnahan's refusal to rely on Wolfrum's opinion does not demonstrate that his articulated safety concerns were pretextual.

Tokar also points out that the City's doctors failed to account for her good performance history in their evaluations of her job fitness. Had Bresnahan knowingly withheld material information from the doctors, his omission would suggest a deliberate attempt to skew the results, which, in turn, might show that his proffered safety justification was a mere cover-up for discrimination. But had the doctors considered Tokar's driving record, such information would not have changed their prognosis. Tokar argues that her driving record was material, but to establish this, she misconstrues the record. At their depositions, Drs. Janik and Wasyliw commented that an individual's past driving performance was a good predictor of future performance. However, the doctors explained that that proposition held true in limited circumstances, none of which applied to Tokar. Janik testified that he would expect a person with a good driving record to continue driving without incident as long as the individual did not suffer from a psychopathology. Wasyliw confirmed that psychotic drivers posed a greater risk than the average person. He added that past performance would be predictive of future

performance if the individual's psychological condition had not changed. Tokar's condition, he observed, had deteriorated between the time of his first examination in July 1995 and the second evaluation in August 1996. Thus, Tokar's past performance was an immaterial consideration: the doctors would have still found her incapable of resuming her duties. As such, there is no indication that Bresnahan's actions-- his reliance on the Isaac Ray Center doctors' evaluations, his decision to remove Tokar from her driving duties as of January 6, 1995, and his refusal to reinstate her upon the urging of her doctor-- were motivated by anything other than safety considerations.[5]

---

[5] In its summary judgment motion, the City also sets forth medical opinions of Tokar's mental state subsequent to this litigation. This court's inquiry, and the issue at trial, is what Bresnahan and Lanton believed at the time they took action against Tokar, whether it be in placing her on leave in September 1994 or January 1995 or in refusing to permit her return to work on several occasions throughout 1995 and early 1996. Therefore, Tokar's recent condition has no bearing on the pertinent issues and the court declines to consider her recent psychological status. In the same way, Tokar's Medicare application and the related Social Security Administration ("SSA") determination in which Tokar was deemed "disabled" has no bearing on the issue at hand. The City argues that the SSA application and decision conclusively prove Tokar's inability to work, but the SSA decision was announced in December 1996, almost a full year after the allegedly retaliatory act of January 1996 took place. Thus, the SSA decision is irrelevant to the court's inquiry into the earlier retaliatory acts taken against Tokar. Compare with Cleveland v. Policy Management Sys. Corp., 526 U.S. 795, 806, 119 S.Ct. 1597, 1603, 143 L.Ed. 2d 966 (1999) (holding that an ADA claimant must explain a contradiction that arises out of an earlier Social Security Disability Insurance total disability claim). The court takes no position on whether Cleveland, which addressed an ADA discrimination claim, applies to the facts of the instant retaliation case.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion to alter or vacate judgment is granted in part and denied in part. This court's previous judgment in favor of the City, entered on December 21, 1999, is hereby vacated to the extent that it is inconsistent with this opinion and order. No hearing is necessary. This case shall proceed to trial on the matter of whether Tokar's placement on paid leave constituted a retaliatory act.

Enter:

_David H. Coar_

David H. Coar

**United States District Judge**

Dated: **AUG 2 3 2000**